The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Thomas M. Harris presiding. All right, good morning, counsel. This is case number 4-23-1187, Melissa Giuliano v. Kaye Jackson. First, I'd like to have counsel identify themselves for the record, all counsel who will be arguing today. First, for the appellate. You're not, Your Honor. My name is John Watson from Craig & Craig. I represent Kaye Jackson. Also with me is Jack Kiley. I will be making the opening argument for the appellant, and Mr. Kiley will be making the rebuttal argument. We would ask pursuant to local rule to reserve five minutes for rebuttal time. All right, that will be allowed. Good morning, Your Honors. My name is Timothy Chartrand from Williamson-Webster-Falbenglison. Representing the plaintiff appellee, Melissa Giuliano today. All right, thank you. So, Mr. Watson, I understand you will proceed first. That's correct, Your Honor. And you may proceed. Thank you. May it please the court, Your Honors, counsel, Mr. Chartrand, Mr. Kiley. Again, I am John Watson. I represent Kaye Jackson. Good morning, Justices Dougherty, Turner, and Harris. A trial judge has an important role in serving as the gatekeeper of the evidence and making sure that improper evidence and improper witnesses do not testify. However, when that role is abused and proper evidence is kept from the jury, a fair trial cannot be had. Here, Judge Kenneth Deal barred a wholly appropriate witness that would have changed the complexion of the trial and presented a different, proper, and reasonable perspective to the jury on how the events transpired. In doing so, Judge Deal provided no reasoning, provided no detail in his multiple orders. Accordingly, we are left only with a reasonable conclusion that Judge Deal barred expert Michael DiTallo upon Fry and Donaldson principles. Without making the proper and necessary findings or explaining his decision, in that role as gatekeeper of the evidence, Judge Deal failed and this case should be reversed and remanded for a new trial. It also must be remembered the context of the proceedings. There existed a contested issue and a charge of willful and wanton reckless conduct and a prayer for punitive hold at the time of trial. Now, the motion to amend the pleadings and seek punitive damages was opposed. That opposition was overruled. Accordingly, the case went to trial on that basis. Opening statements were made in the context of a willful and wanton punitive damages case where a heightened level of points were made by plaintiff's counsel in the opening statement and the evidence presented in plaintiff's case in chief also highlighting those points that would have been reasonable and expected in a willful and wanton reckless conduct case. However, counsel moved just after presenting his evidence, withdrew that count and dismissed the willful and wanton claim and the prayer for punitive damages just before the defendant put on its evidence. At this point in time, the plaintiff had made a primate fascia case. It certainly is a concerning situation and a procedure that I think should not be encouraged, but this highlights what we have before Judge Deal. I would go back and note that when presented with this situation, defense counsel Mr. Jack Kiley really has absolutely no choice. He's either left with objecting to that being withdrawn or, you know, objecting to it withdrawn and allowing his plaintiff to be subject to a punitive damage award. That did not make sense and he could not do anything other than what he did do, which was make no objection. I think otherwise it would have been... What about counsel the submission of some curative instruction? I thought about this in a lot of different ways because it certainly is an unusual tactic. Plaintiff has met this prima facie case and I was thinking about what procedural avenue would have discouraged this from happening. I'm not sure what curative instruction could be made and this is actually the first time I've seen it. I've not come across it. I don't know if your honors have come across it before. Mr. Watson, could you just explain what is it that needed to be cured? So what we have is in plaintiff's opening argument, I mean, there's a few things that are going on here. I'm critical of Judge Deal for not taking into account that that's a willful and wanton case. But we have this argument that's made and I'm looking at page 366 and 367 of the record where there is an argument made that talks about the burnout. You see smoke. That's behind Kay Jackson's tires. Smoke. He's still doing his burnout. Let's put that into context, guys. This is a supplemental record 367. That a football field of skid marks. A burnout while other students as other vehicles are in the parking lot. It's negligent. It's beyond negligent. That's reckless. This is the debris from Melissa's vehicle as well. But we have even more evidence, guys. This is a panning video. This is before the crash. So there's more that's talked about this reckless conduct in opening statement. But I think here's where it gets even more concerning. This is a supplemental record page 372 and 373. Talks about the reasons we're here. And it goes through in detail about the pain and suffering, the damages of why we're here. But then it says the second reason we're here is accountability. Right and wrong. It's four and a half years since the crash. Four and a half years since Kate has a chance to tell exactly what happened. I messed up. Let me right my wrong. And had he done that to the investigating officers at the scene, had he done that when we filed the lawsuit, had he done that when we took his deposition in April 2021, and had he done that in this trial, which we expect him not to do, we wouldn't even be here. We wouldn't have to talk with you all fine folks. I'm sorry. We wouldn't have to. Let me interrupt you for a moment. Which issue on appeal is this relevant or relevant to? Well, this is about the decision making process and the results of Judge Neal with regard to striking Mike Dottalo. I mean, that that's at the heart of it. And we'll go through going back and let's I'll talk about why Dottalo is so important. But I think in the context of these arguments that are made, it puts the jury in this frame of mind of punishing the defendant for reckless conduct, punishing the defendant for not taking accountability of his actions. Other than the reference to reckless conduct, what in the attorney's opening statement would be improper if there were not a willful and wanton count? Your Honor, I think that whole recitation there with with regard to the accountability. I mean, the accountability is not an issue in a negligence case. Certainly liability and causation and damages are. But you're not intending to inflame the jury with regard to this. However, when you have can I just ask? This to me sounds like a closing argument, not an opening statement. Was it objected to on that basis? It was not objected to. I agree with you that this does seem like a closing argument, not an opening statement. However, in the context of a willful and wanton case, I think this is at least within the bounds of reasonableness. Talking about what the jury is going to have to assess in terms of damages and one of those elements of damage is going to be punishment. And so I think the issue of accountability at least would seem reasonable in that light. However, when it's taken off the table, none of that would have been proper. Is accountability in your mind equal to punishment? I mean, paying a debt that's due is accountability, but it's compensatory. Well, it is. But I think when you're talking about willful and wanton conduct, you really have to talk about issues that are punishment. And it was interesting, I think there was potential evidence with regard to what the value of Kay Jackson was and what and there was going to be evidence presented on that. However, when that was taken off the table, certainly that is not relevant anymore because the punitive damages was no longer there. And I'm kind of switching gears a little bit. But I think about this idea of like we do have a verdict here of $1.463 million on a case where we had medical expenses of $147,000 and lost earnings of $16,000. The jury calculated disability loss of normal life at $200,000, loss of normal life reasonably certain to be experienced in the future of $300,000, pain and suffering of $200,000, and future pain and suffering at $400,000, and a present cash value of future medical expenses of $150,000. But this case, at a $1.463 million verdict, has the earmarks of the jury was angry, the jury was punished, was punishing. What trial court ruling are you asking us to reverse on this issue? Well, I think it's collectively. I think collectively this all goes to the heart of barring the, I think the only witness that had competent testimony about the speed. And I think he was the only, I mean, really what we have here is we have testimony from an officer about skid marks that are 210 feet long. But Mike Tahalo presents this picture that the cops had it wrong, that the 210 feet marks could not have been marks that came from plus a speed that no other witness could put on, this 21 to 25 miles per hour. I think when you look at that, I think a jury could say, okay, well, it's in a parking lot and you have evidence from the plaintiff that it's too fast or excessive, but 21 to 25 does not seem to be too fast or excessive. And if they also think about this idea that, well, maybe the police officers did have it wrong. Maybe one, they measure the wrong tire marks. Number two, maybe they measured tire marks, but then they actually transposed the number. If you look at what Mike Tahalo was going to offer by his calculations, those numbers may have been in about a range of 120 to 140. Maybe the 210 that was recorded in report should have been 120. What it puts in light about this evidence that was put in against the defendant maybe was not accurate. And it could be that Mike Tahalo had the only accurate testimony with regard to the length of potential skid marks and the distance traveled and the speed of Cade's vehicle before this contact happened. And when you look at that, I've got a bunch of notes about why Mike Tahalo is so important, but when you have a case where if the jury hears that testimony, it says, okay, well, maybe 21 to 25 is not that unreasonable. And maybe this evidence about the accelerator and the brake, maybe it wasn't really a burnout. So now we're left with a plaintiff and a defendant in a parking lot at really an uncontrolled area where the cars are intersecting. And I think the plaintiff is traveling eastbound, the defendant's traveling northbound. It could be that the jury says, well, and testimony from the plaintiff that she did not see this vehicle. I think there was evidence that she wasn't keeping that proper lookout. They might have looked at those arguments about contributory fault. They may have looked at those arguments about negligence and reasonable care much more in a better light. And obviously they didn't do that with a $1.4 to $1.5 million verdict. They discarded those arguments wholly and completely. So it does change the absolute complexion of this trial. It was hugely important. So I mean, those I think are really the main points and the main evidence here. I mean, there were potentially other witnesses, but none of them could do what- Several minutes ago, you went through the jury verdict as to how they calculated damages for certain categories. And you listed several of them. One of them, of course, being pain and suffering and future medical expenses. But are you saying that any of those calculations that jury came up with or the awards that the jury decided to give plaintiff were somehow arrived at improperly by the jury? Is that part of this argument? Well, there is this second argument, yes. And I'm not going to say the jury had arrived at at least the figures with regard to medical care and with regard to futures. I'm not going to put this on the jury at all. But there was testimony barred with regard to plaintiff's own admission that she had a subsequent event that aggravated her condition. So at least there was evidence that was barred. So this is part of our second argument. I mean, I look at it- You're saying the jury actually considered punitive damages, even though that was withdrawn by the plaintiff. And therefore, the numbers that they came up with these certain categories were inappropriate or skewed in some way. But I don't see where you're tying that together. You're just saying maybe the jury considered willful and wanton conduct, but you're not showing that the numbers that they came up with as awards for damages were in any way arrived at improperly. That's what's confusing me here. Judge, what I'm looking at is I've got a case where I've got about $165,000 of hard specials, and we've got a verdict of $1.46 million. I mean, that to me, I mean, it's all on their verdict form as to where they're getting it. But ultimately, I think the jury is looking at it, and they're signing the verdict form saying, what do we want to do here? And they look at it and said, you know, here's our elements of damage. You know, I'd like this case to be around $1.5 million. How do we get there? I mean, it's... Counsel, that sounds like rank speculation. I mean, we don't expect the jury to be made up of lawyers and claims adjusters who know what a ratio between specials and the verdict is supposed to be. They don't know any of that. They decide based on what they think is right. It sounds like rank speculation to say that they did something off the reservation. I know. And I think where we go is like, you can go and get, you know, talk with jurors and try to get affidavits. And I don't think that ever has been looked at very favorably. And I don't think it's something that we want to do here. You know, so, but I think you can look at it from our experience in the field, your experience as jurists, your experience as lawyers, to know that something didn't add up about those numbers. Can we get to your second argument about the Voican issue? Yeah. In Voican, there was an injury at issue and an earlier injury. And the Supreme Court said, you're going to try and draw some connection, then you have to have expert testimony, right? And you think that Voican doesn't apply here because you're trying to bring in a subsequent injury. If this plaintiff had sued somebody at the ballgame and said, hey, I was injured at the wanted to bring up your accident, Voican would apply, right? Same two injuries, it applies in one circumstance, but not the other. Does that make any sense? Well, let me look at it this way. I think in my mind, Voican got rid of the same part of the body rule. So, just simply arguing that, well, you had a previous neck injury, now you've got a accident which involves the neck injury and the jury can consider it. So, I think before you go down that road, you have to have some type of medical testimony. But Voican does not exclude the possibility that, one, you can get that medical testimony from plaintiff's own treating physicians. And I've seen that argument quite a bit where it's like, no, you can't ask these questions, you got to get your own expert. And the answer is, well, no, I think you can cross-examine, you could address that with plaintiff's own treaters or plaintiff's own expert and say there is an independent expert that the plaintiff has. So, I don't think Voican bars that. But specifically, Voican talks about an injury is relevant and tends to negate causation, negate or reduce damages or for impeachment. And I think those last two are particularly important, to negate or reduce damages or impeachment. But then this comes down to the next issue, is that if you have a plaintiff that says, listen, I think I had a previous injury and it's been aggravated by this new injury. If that wasn't helpful to your case, and your objection would be sustained like that, because she doesn't have the ability to give that well, how do you explain that as a lay person? Well, my pain is increased in my shoulder, my neck, my stiffness is increased. I am out of time, if your honors allow me to answer this question. You may. Thank you. My pain is increased, my range of motion is increased. It's been six months and I've had no pain in my neck. And now after this accident, I've got pain in my neck. We allow that testimony, judges allow that testimony all the time. So, this is the same what we have here. We have a person saying is that I had an aggravation. Well, how have you had an aggravation? Well, after this incident at the ballpark, my pain increased my step. This is all fair for lay witnesses and plaintiffs. It's fair on this shoe. I think it should be fair on this side. I think that testimony was improperly barred. Again, thank you, your honors. Mr. Watson, if I may just ask my colleagues if it's okay with them, if I ask a question beyond Mr. Watson's time. All right, Mr. Watson, the same part of the body rule here. What part of the body are you saying that this testimony was relevant to? I believe this testimony was relevant to the shoulder and neck. Let me see if I can bring out the... Okay, shoulder and neck. And where was this admission? That was in the answers to interrogatories, right? Yes, that was in the and what was referenced? What part of the body was referenced in the answered interrogatory? So this is interrogatory number 12. This is on the record C646. Subject to objection, plaintiff had an incident of all game where a woman was falling down and grabbed her head to break her fall. She believes she did not. If she did not have this occurrence, I think meaning the motor vehicle accident, it would not have injured her because of her injuries from this crash. This incident aggravated her head injury. Let me emphasize then, this incident aggravated her head injury. You've been talking about a neck injury. How is this even the same part of the body now? How can you call that an admission sufficient to present to the jury without expert testimony when it isn't even the same part of the body? Well, I'll say this, I think that that testimony was barred as to trial. So exploring exactly what she meant by the head injury was aggravated. I mean, maybe you call it the head, but she's saying that the head was aggravated or at least whatever head injury she had was aggravated. So she's claiming head injury as a part of her damages here. Thank you, Mr. Watson. You're out of time. Mr. Chartrand, you may proceed with your argument. Good morning, your honors. May it please the court, counsels. My name is Tim Chartrand. I represent the Apple League plaintiff, Melissa Giuliano, in this case. I'll begin with the recitation of the opening statement and make a few points clear here. Oh, excuse me, Mr. Chartrand. I just, I want to ask you, what is relevant to, there are two issues identified on appeal. I don't want, I'm not going to dictate how you proceed with argument, but I also don't want you to run out of time in regards to the two arguments that are identified as issues on appeal. Yeah, thank you, your honor. And that was the point I was going to make. It isn't relevant to any of the points that the defendant has presented on appeal. They never appealed that particular procedure that they now claim somehow wrong, which was beginning our case in chief with Wilhelm Watt in conduct, and then withdrawing it with no objection by the defense counsel. It has no relevancy to Mr. Detallo's opinions, nor does it have any relevancy whatsoever to the Boykin issue, which are the two main points on appeal presented by the defendant. So it's not relevant whatsoever. In regards to Mr. Detallo's opinions and the reason that they were stricken, the trial court had two bases for which they struck Mr. Detallo's opinions. Namely, the first basis, which was that his opinions, the two opinions he offered, were speculative and not rooted in sufficient physical evidence. The second basis for which they barred Mr. Detallo's opinions was that there were multiple eyewitnesses to the defendant's truck speed, the tire marks, and the crash itself, which are topics that are not beyond the average kin of a lay person and jury. So Mr. Detallo's opinions did not assist the trier of fact in this case because both they were speculative and because they regarded topics that were not beyond the average kin of a lay person. Mr. Detallo's opinions were twofold. The first was that the defendant's he never actually calculated the speed averages. Some 18 to 20 feet from a point of impact, he admits he does not know, nor know within a reasonable degree of range. And again, that's plus or minus a guess of a few feet. Mr. Chartrand, does the testimony of an expert to facts within a range make it inherently speculative or does that just go to the general question? I would say the range, no. But in this particular case, your honor, what he's trying to do is connect a range to a point of impact he does not know, nor knows within a reasonable degree of certainty. And so that's what makes this particular first opinion and the second opinion speculative. Because the second opinion is that the 210 feet, 10 inches worth of office report would were not from the defendant's truck because Mr. Detallo's perceived starting point of the truck in a video to, again, a point of impact that he does not know, nor knows within a reasonable range, does not measure 210 feet, 10 inches. Well, of course, you can't give an opinion as to a speed from a point of impact and the distance from a point of impact when you don't know the point of impact whatsoever. That's what renders both of these opinions speculative. And they weren't based on sufficient physical evidence. We believe that the Strickland case is instructive out of the fifth district in which they barred accident reconstruction testimony because there was not enough physical evidence. Mr. Chartrand, the expert did know, everybody knew that the point of impact was within that intersection, somewhere within that intersection in the parking lot. So are you saying that not being able to identify within a matter of so many feet within the intersection or that exact point made his opinion speculative? I am to a certain extent, Your Honor. What I'm saying is that when he tries to give the speed of the truck some 18 to 20 feet from a point of impact, there's obviously large variance there within his opinion when he doesn't know the point of impact. The vehicles, unfortunately, were moved as a result of this crash, the defendant's truck involuntarily and the plaintiff's involuntarily because she was pushed into a different lane of travel due to the force of the impact. And so by him not even attempting to calculate the point of impact, take into consideration the testimony by the witnesses or even be presented with a hypothetical. Hypothetically, had this been the end point of impact, what would be your opinions? That renders it speculative. None of those things occurred here, Your Honor. In regards to the second basis for which the trial work properly barred Mr. Ditalo's opinions, there were multiple eyewitnesses to his speed, tire marks in the crash itself, including Ms. Cassidy Loy, who was a student at Jersey Community High School at the time of this crash, who was coming out during her lunch period and saw Mr. Jackson from his impact, testified that his speed was too fast for the parking lot, testified as to his intentional burnout. Mr. Fabry II, who was a teacher and saw through the window the actions of Mr. Jackson and characterized the speed as too fast for the parking lot. There was also the officer Portwood's testimony regarding the skid marks and the photograph he took that was admitted into evidence. It was also the video itself that showed smoke behind the tires of the defendant's truck, as well as the time that elapsed from his starting point to a point right before the point of impact. And then the defendant's testimony himself. The defendant testified on direct examination that he was traveling too fast for the parking lot conditions. He also testified when shown the photograph of the 210 feet worth of skid marks, he testified that those very well could have been his. And he also unequivocally testified that there were skid marks left after the crash. The walking case is directly on point on this, your honor. In that case, our Supreme Court was confronted with multiple eyewitnesses to the speed of a vehicle, as well as skid marks. And what the Supreme Court said is that they rejected the need for an accident reconstruction testimony in that case, because they said that the jury had all that they needed from the physical evidence and the eyewitness testimony. Speed is not a topic beyond the average of a lay person or juror, and they are able to express opinions on speed either in miles per hour, or if they can't do so, they can characterize it as too fast or too slow. Mr. Chartrand, can you explain or just interpret for us here today what the expert was saying in regards to his use of averages? We're talking about speed averages and the calculations. Can you just generally explain to us what he was saying and how you believe that to have been inadequate to form the basis of a speed opinion? Sure. Thank you for your question, your honor. So my understanding is that Mr. Ditalo performed what's called a video analysis where he saw one video that was non-panning that showed Mr. Jackson getting into the parking lot and stopping to pick up his friends. And that video's lens ends at some point before the point of impact. And what Mr. Ditalo did was he took the time it took from Mr. Jackson to get from a stop position to a first structure like a tree, and then from that tree to another point that he picked out, and from that point to another point. And he used the times elapsed in a mathematical formula to come up with speed averages, but he never actually calculated how close those speed averages were. So at his discovery deposition, he guessed that they were within two to three miles per hour. And then at his formal offer of proof, he attempted to actually present those calculations, but then we objected because it violated rule 213 disclosures. And the trial court agreed and the defendant's attorney acquiesced to that ruling by the trial court. Okay, so let's just take two scenarios. One, what actually happened? What did you argue in closing argument was defendant's speed, maximum speed? We did not argue a miles per hour speed, Your Honor. There was no evidence adduced as to the actual miles per hour. When Mr. Ditalo was actually barred, there was evidence regarding his miles per hour. The defense counsel presented one of the occupants of the truck who testified in his discovery deposition that he was traveling somewhere around the speed that Mr. Ditalo came up with, somewhere around 25 miles per hour, but they didn't present that occupant as a trial witness. So what we argued in the closing arguments is that he was simply driving too fast for the parking lot conditions as supported by testimony of Mr. Fabry as well as Cassidy Loy. Okay, and which did, again, did Mr. Jackson in his testimony state that as well? He was driving too fast for conditions. Yeah, so the way that this happened on direct examination is I asked him if he would agree that a reasonable driver would drive at such a speed in the parking lot so that they could stop if a car was backing out or a pedestrian was coming out, and he agreed with that. And then he agreed further that he was not able to stop in time for Mrs. Giuliano's vehicle, and therefore he agreed that he was not driving like a reasonable driver should in the parking lot. And that's how that testimony came out. Okay, thank you. Yes, thank you, Your Honor. And so in regards to the two bases for which the both that they're speculative and that there was enough eyewitness and physical evidence, the trial court was correct and did not abuse its discretion in barring Mr. DiTallo's opinions. I'll also say this, Your Honors. Even assuming that the trial court were in error in barring Mr. DiTallo's opinion, which we believe they weren't, the defendants were not prejudiced in the way they presented their case. Mr. DiTallo's opinions never said that his flawed speed ranges made Mr. Jackson's truck at a safe speed for the parking lot. He never opined that Mr. Jackson did not perform an intentional burnout because, again, he didn't have enough physical evidence. He didn't know if the parking lot was too wet or dry or if there was brake issues. Without Mr. DiTallo's opinions, the defendants still argued that he did not do an intentional burnout. They still adduced evidence at trial of one of his occupants that he wasn't driving too slow. So they are simply not prejudiced by the barring of Mr. DiTallo assuming the trial court was in error in barring his opinions, which we don't believe they were. As to the Boykin issue, Your Honor, the answer to the interrogatory has been read for the Sonarble Court. We believe all arguments regarded in the answers to interrogatories has been waived for the four reasons we presented in our responsive brief. But notwithstanding the waiver, the trial court was not in error in granting plaintiff's motion in limine, barring any evidence of the subsequent event at the volleyball game and its purported effects on plaintiff's injuries from the crash. And the reason is, is because Boykin and his progeny makes clear that the defendant needed to lay medical foundation causally linking this subsequent event to the injuries from the crash. And they simply did not do that or even attempt to do that. They could have hired a Rule 213 F3 expert witness to provide that testimony. They could have tried to get that testimony through the treating experts, and they didn't even attempt to do either of those two things. And so under Boykin, they were required to do that for the first two reasons Boykin says that a prior incident could be relevant, which is to negate causation or negate and diminish damages. They have to lay that medical foundation. They did not, unless the Boykin exception applies, which I'll talk about in a little bit. And the third reason is for impeachment purposes. And they claim that they would have used this answer to interrogatories for impeachment purposes. But Boykin gives examples as to how these prior incidents can be used for impeachment purposes. And so do subsequent cases. And what's envisioned by this line of questioning is that they'll go to the treating doctor and they'll say, did the plaintiff ever tell you that they had this prior incident? No, they didn't tell me that. Would that affect your causation opinions? Yeah, it could, or maybe they say it couldn't. But that's how you impeach the plaintiff and the treating doctor with prior and subsequent incidents. Here, the defense didn't even try to do that line of questioning at all. They were not under the ruling of the motion in Lemonade when the evidence depositions of these two doctors were taken. They just simply didn't bring it up, answers to interrogatories or the subsequent incident. So they cannot now claim prejudice because they didn't attempt the impeachment itself. And then as regards to the exception of Boykin, which the defense claims in their briefs that applies here, Boykin again stands for the rule that you have to lay the medical foundation linking these subsequent or prior incidents to the injuries from the crash. However, there is an exception when lay people can readily appreciate the connection. In Boykin, as well as in the Moffitt case, which is a fourth district case, they talked about this exception and whether it applied to those two cases. And in Boykin, they said the exception did not apply because in that case, there was evidence in a medical record that the plaintiff had injured his neck when he was six playing hockey. And in the Moffitt case, there was testimony by the plaintiff and her doctors about vision issues. And what those courts said, our Supreme Court in the fourth district said that that particular evidence is not clear enough that a lay jury can readily appreciate the connection. It doesn't talk about the nature and extent of the injury, what parts of the eye or the neck were involved, what are the signs or symptoms with those and how they relate to the signs and symptoms of the crash. And the same is true here, your honors. The answer to interrogatory one is not a judicial admission. It can't be under HACC or International Harvesting Company because it's a matter of opinion, a lay opinion on a medical condition and doctors are better suited for that particular opinion. But in addition, if you look to the substance of the interrogatory answer, it just references generally her head. It doesn't say what part of her head, what the nature and extent of the injury was, what the signs and symptoms she felt afterwards. And it certainly cannot be related as this honorable court's questions implied, it cannot be related to her neck or shoulder. Mr. Chartrand, did a plaintiff request damages for a head injury? So the only thing that was related to her head, your honor, that was linked to this crash was a post-concussion syndrome that had a whole host of signs and symptoms like nausea, sensitivity to light, nausea, I'm sorry, nausea, headaches, things of that nature. But all of her treatment related to her post-concussion syndrome coincided with her treatment to her neck. So there's really no differentiating the medical bills from that treatment. But in addition, that answer to interrogatory simply does not know how it relates to her post-concussion syndrome at all. It just simply says she had an injury, an aggravation to her head. That's all it says. And that's in line with the Boykin and the Moffitt testimony and evidence that both cases said, that's not enough for you to apply this Boykin exception that the lay jury can readily appreciate the connection. It's just simply not enough. And in the- Mr. Chartrand, may I ask you, was this interrogatory response made before or after the plaintiff's deposition? It was made before, your honor. Was it explored at her deposition? It was, your honor. That exploration transcript given to the trial court in connection with this ruling? In connection with this ruling, I don't believe it was because it was a motion in limine. I do believe the transcript has been provided to the trial court regarding other rulings, or at least the substance of the transcript had been. And in particular, I think it may have been provided to the trial court when the defense filed a motion for reconsideration on this motion in limine granting. And in that particular testimony, the plaintiff was very clear that this subsequent event had no effect whatsoever on her neck. And she testified to that over and over again, which also bears to the conclusion that the defense did not treat this as a judicial emission, because as this honorable court is aware, a judicial mission cannot be controverted. If you ask the question at her deposition, then you just open the door for it to be contributed if you really do believe it's a judicial admission, which it's clear they didn't. They never called it a judicial admission at the trial court level. They called it an admission against interest, which is an evidentiary admission that can be controverted. And so, your honors, the trial court was correct in granting the plaintiff's motion in limine, barring the subsequent event under boycott and progeny, certainly did not abuse its discretion in so doing. And for those reasons, the trial court also did not abuse its discretion in denying the defense's motion for a new trial. And we would ask that all of the relief requested by the appellant be denied and that this appeal be denied. Thank you. Okay. Thank you. Mr. Kiley, rebuttal argument. Thank you. May it please the court and counsel. I'm going to start just on the admission issue just because that's where Mr. Chartrand left off. And I look at this a little bit differently. I understand the potential implication of boycott and so forth. But to me, this is a matter of the party should be permitted to rely on the admissions of an adverse party in litigation. We do that to trim the fat off the issues, requests to admit facts and so forth. And we draw the analogy in our reply brief that had Ms. Giuliano admitted that she had been injured subsequent to our accident, we shouldn't have to go find alternative proof or additional proof, to support the plaintiff's own admission. But counsel, you're begging the question of connection. If she admitted that she'd hurt her foot in a subsequent accident, that doesn't get you there. It's some connection between the admitted injury and the original injury. Your Honor, and again, this is where I think we're coming at things differently. I'm not looking at this from the Voight-Kinn perspective. I'm looking at it from the perspective that the plaintiff is being permitted to put on a manufactured account of her life after the accident. This would have been relevant to her quality of life when we've got questions about pain and suffering and so forth. The fact of the matter is she felt well enough to be going to ballgames a couple of months after the accident when she was still actively treating, and we weren't permitted to inquire about that. It's not, we're not saying- The trial judge didn't permit you to ask whether she went to ballgames? No, no, Judge. We weren't allowed to get into how she was feeling. In other words, that's why this aggravated injury is important, I think, because it shows what she was up to in the months following the accident. Of course, I could have been asked if she went to a ballgame. I don't think that's a fair characterization of what you asked the court to rule on and what it ruled on. The court was asked to rule on the subsequent injury at the ballgame. I've seen no indication that you couldn't get into what her I think you're kind of moving the goalposts a little. Well, Your Honor, that's not by design. I just struggle with the general concept that if a party's admitting to something happening, we should be able to use that in any way we see fit that it would be advantageous to our defense. Here we have a situation where she's admitting that she reported it to her providers. It was obviously significant enough that it was disclosed in discovery and discussed with her providers. I'll move on from that point unless there's other questions in that regard to the Detallo issue, which I do believe is probably the more critical issue in this case. The plaintiff has taken the position here, Your Honor, that they don't have an issue with the methodologies or with Mr. Detallo's qualifications. They claim it's a matter of foundation only. Mr. Chartrand mentioned several times the trial court had two bases for striking Mr. Detallo as a witness. The judge never articulated those two bases. What he did was adopt the plaintiff's arguments. If we're going to look at strictly what the plaintiff has said here, that this is a matter of foundation, then we need to look at what Mr. Detallo considered in arriving at his opinions. He looked at the police material, surveillance videos, photographs, vehicle inspections, the depositions of both drivers, as well as six witnesses to the occurrence. He is the only person that analyzed the video that was taken at the time. There's no criticism of his methodologies or his qualifications. No one is qualified to say that what he extrapolated in his video analysis is incorrect. If he's saying that the police got it wrong, as Mr. Watson said, it was a matter of transposing numbers or what have you, that's important evidence. This 210 feet of skid marks was a critical theme for the plaintiff. It was articulated in the complaint. It was articulated in an argument. The fact of the matter is, Kay Jackson did not admit that those would have been his skid marks. He was shown a single photograph at trial, and he denied doing a burnout. The burnout could not have happened absent... The skid mark couldn't have happened absent a burnout. There's no admission by the plaintiff, or excuse me, by my client, Kay Jackson, that the plaintiff can hang her hat on here. The fact of the matter is... Would the jury have had to agree with plaintiff that the defendant had left the skid marks in order to return a verdict for a plaintiff? No, no, I don't think so. But I do think that the context here matters. And again, when you're using like too fast, all these subjective descriptions, and then you have a scientific basis to give a number where people can say, okay, well, maybe that is a little too fast, but it's four miles an hour too fast, not 25 miles an hour too fast. We didn't have a number, but we did have his scientific evidence. We can all agree. If you see the video, we know where Kay's vehicle starts. It sits stationary for seconds. Okay. I have no time remaining. You may complete your answer. Thank you. We know where his vehicle starts. And again, there's no criticism of the methodologies or the qualifications of the expert. And the expert says simply the police got it wrong. And for that not to come into evidence and to suggest it didn't prejudice my client somehow, this is a young man who's now been slapped with a seven figure verdict. And we would have had the opportunity to put on credible evidence that the first people on the scene who did not look at the video evidence got it wrong. And that would have been important evidence here. Okay. Thank you, Mr. Kiley. Thank you. Thank you. All three council for your arguments. The court will take the matter under advisement and we will issue a written decision.